May it please the Court, Counsel, my name is Alex Cornea and I am here for the appellant Robert Blackburn. A person who has a chronic disease whether physical or psychiatric and is under continuous treatment for it with heavy drugs is likely to have better and worse treatment. This quote by Judge Posner in the 2008 Seventh Circuit case of Bower v. Estrue illustrates the common sense principle that is at the heart of this case that is not enough to simply isolate the claimant Mr. Blackburn's good days and from them draw the inference that his more numerous bad days should be discounted in an inquiry into his disability. Employers expect you to show up and be functional every day, not 11 out of 20 days. Longitudinal evidence gathered by one medical source over time is meant to be understood like a movie rather than a series of snapshots and just as a movie cannot be understood by reviewing a few selected still frames out of order, a longitudinally developed medical record cannot be understood by focusing on the outliers rather than the trend as a whole. This case involves the upholding of an agency denial of eligibility for Social Security disability and supplemental security income benefits. The medical record begins in 2008 when Blackburn was hospitalized after a suicide attempt and after a serious deterioration of his mental state. Although it is mentioned in the record that his condition may have begun as early as 2004 or earlier, potentially since he was 15 years old. He was diagnosed with bipolar disorder at the time of the hospitalization in 2000. What's the onset date? The onset date that was listed in the application, Your Honor, is April of 2009. But the medical record, the detailed medical record, goes back to the initial hospitalization in August of 2008. On this particular issue, there is, I believe, potentially one other hospital record that goes back to May of 2008, but it's not germane, I think, to the impairments at issue. He was diagnosed with bipolar disorder at the time of the initial hospitalization in 2008 by a Dr. Sable and was assessed a global assessment of functioning score between 45 and 50, indicating severe symptoms, which matched the hospitalization and the suicidal ideation that he was expressing at that time. After this initial hospitalization, he began receiving treatment at Hillcrest Mental Health Center in Dubuque, Iowa. When? That was, there was an intake on November 5th, 2008, and that happened just a couple of months after he was released from the hospital. The record reflects that he had been receiving treatment, I think, intermittently for this for years prior to the hospitalization. We don't have any notes in the record, though, from that, any of those earlier interactions with the mental health system. Regardless of his condition, I read in the briefs, and I think it's uncontested, that he was able to do some kind, is able to do some kind of sedentary work, packaging, two or three other categories of things. Why doesn't that alone preclude you from recovery? Well, I would disagree that it's uncontested that he would be able to do that sort of work. Was there any evidence to the contrary? Yes, Your Honor. I think the medical evidence... Specifically countering those categories of work? Certainly, Your Honor. There was a mental RFC, which is a residual function capacity questionnaire, that was completed by the nurse practitioner, Sarah Justman. The nurse practitioner who had seen him 23 times over a period of three years and was the best person, given his situation, to know his condition. Those are just the usual checkboxes? Those are the usual checkboxes, Your Honor. Which we have considered a very little weight in quite a few cases. And, Your Honor, they are very sparse when it comes to information. And the ALJ thought inconsistent with her prior treatment history. Yes, Your Honor. And that gets into, I think... So you don't... It doesn't get you anywhere. Well, I think that the inconsistency is really one of the crux of one of our two arguments in this particular case. I do not believe that there is an inconsistency, and the ALJ's finding of inconsistency is, we believe, the major flaw in the ALJ's decision. Over a period of a little under three years, Ms. Justman saw Mr. Blackburn a total of 23 times. Not all of those was he assessed a GAF score, but in some of those times he was. And if you look at the progression... The check marks were April of 2011. The mental RFC questionnaire is the only time that Ms. Justman was asked directly the sorts of questions that would indicate whether or not Mr. Blackburn would be able to work. I mean, the purpose of the questionnaire is different than the purpose of treatment notes, which is what comprises... But her opinion as to disability is not relevant. It is the ALJ's decision. As to physical or mental condition is what matters to the ALJ's. I agree, Your Honor. I think that that is correct. And the medical opinions... I agree that the RFC questionnaire that Ms. Justman filled out is the only time she was ever asked those particular questions. I think it's pretty routine. But the thing that is the most important to focus on is not so much the questionnaire, but rather the voluminous treatment notes that Ms. Justman provided over a period of years, which show that Mr. Blackburn had a very erratic progression of the manifestation of the symptoms of his condition. Not only the inconsistency issue, to go back to focus on that for just a moment, the ALJ found that Ms. Justman's opinions were internally inconsistent, which I think does not necessarily reflect an understanding of how diseases such as bipolar disorder work. You have good days, you have bad days. You have to look at the entire... What case says a treating health sources statement that the patient has good days and bad days establishes disability? The Pate Fires case, Your Honor, specifically deals with consideration of GAF scores, and we would consider that to be probably the most important case for the argument dealing with consistency. In the Pate Fires case, there were multiple GAF scores, which is Global Assessment of Functioning, a sort of milestone or summation score that treating nurse practitioners or physicians or whoever is making the assessment can use to sum up that patient's particular condition in that time. The Pate Fires case reversed a Social Security disability denial where GAF scores were not considered in their totality. In other words, certain, just as in this case, certain high scores and good days were isolated but were not looked at as a whole, and there are several very important low GAF scores that were actually not even mentioned in the ALJ opinion. There is one from Ms. Jessman in 2009, June 2009, that was in the severe range, which the Brueggemann case indicates generally indicates a finding of disability. In addition to that, there is a very important GAF score, I think, that shows consistency not just internally but also with the other medical evidence from other sources in the record, which is the consultative examiner that was hired by the commissioner, Dr. Kevin Gibson. Dr. Gibson's report actually indicates that Mr. Blackburn had a GAF score of 45, which again is severe, and the Brueggemann case generally indicates is a finding... would usually necessitate a finding of disability. Going back to my earlier question about the vocational expert testimony, I found the categories that he was able to do would be a final assembler of optical frames, a laundry folder, a night stalker, things of that sort. What evidence in the record is there that he couldn't do that? Vocational expert also testified upon the questioning of the claimant's attorney at that time that two absences a week would make work... would essentially preclude work. One of the things that is talked about over and over in the record is the isolation that Mr. Blackburn will impose when his symptoms are fully manifested. Well, I thought that the idea, though, is that if he's doing work like this, he wouldn't have the kinds of episodes that would cause him to miss work. Also, Your Honor, the other question that was posed by the attorney who was representing Mr. Blackburn at that time has to do with his argumentativeness and his problems interacting with others. That's the point, though. All of those concerns would be remedied by work like what I... Mr. Blackburn would presumably have to still have interaction with the supervisor, and one of the questions that the claimant's attorney at the time posed was, if you got into an argument with your supervisor once a month, how would that affect employability? And I believe her answer verbatim was iffy. And I would tend to agree. I think that seems to be a logical assumption. I'm not sure that you could find a worker in those categories of jobs that doesn't argue with his or her supervisor at least once a month. I agree, Your Honor, but looking at the... This is... We're basically... Your argument boils down to he's disabled because he can't get along with people, even though he has no physical impairments whatsoever. Your Honor, I would agree that that is the most dramatic symptom that shows up in the record of his particular disability. What case even comes close to reversing a denial of benefits on that... for that core reason? Well, Your Honor, I think it shows... The medical evidence, which is what the ALJ has to rely upon, shows over time there are many, many different entries over a period of years that show that his functionality from time to time is rated as severe... But disability is a 12-month test. Correct, Your Honor, and this record is more than 12 months. One argument a month and he's disabled? What vocational expert would ever opine that? Well, Your Honor, the one in this particular record did answer that question. Ify? Ify, and I agree, Your Honor, that is not necessarily the most clear of answers, but I think it does indicate that... It's no help to you at all. Well, I don't think it indicates that she believes that he... She is sure, as an expert, that he would be able to perform those tasks or be able to be employable. It definitely does not indicate confidence, although I wish it would have been more clear, Your Honor, that is true. If I had been the attorney at that, I probably would have asked a follow-up question, quite honestly, but I wasn't there. But it's difficult to find a job with a supervisor you wouldn't argue with. It doesn't... It's never equated to being disabled. Maybe I'm behind the times, but it's just not disability. Your Honor, I would also... also focus on the fact that Mr. Blackburn, during his times when he is not functional, I think we have to focus on that in particular, whether or not he would be able to even show up to work during those particular times. I mean, the argumentativeness, I agree. You know, even thinking of my own personal experience, I can't think of a supervisor I've never argued with. At one time or another. However, the medical evidence, which is what we have to focus on in this particular case, shows that out of 9 out of 20 times, Mr. Blackburn was in the severe range of functioning. He is under commitment to a mental hospital. As of 2011, he was under an ongoing voluntary commitment.  What was the hearing date? The hearing date, Your Honor, I'm trying to remember that. But that's the only... that's the close-off. I thought all of those were short-term commitments as well. Your Honor, in the record itself, he was under commitment as of, I believe, June of 2011. September 2011 was the hearing. So he was under commitment prior to this hearing. And that was indicated by the ALJ in his decision. My point is that he can apply for... if things are worse, he can apply for benefits beginning September 28, 2011. Right? Well, Your Honor, I think the trend of his disease...    He could reapply for benefits here. He could reapply for benefits here. Your Honor, that is true. But I think his condition... You just said, you know, by late 2011, he was, you know, under some kind of watch. But if his condition progresses, as the record shows us that it generally did, then I would expect to see something very similar in an up and down and an erratic set of scores and manifestations of symptoms that would essentially mirror what we see here. And the question is, if you are unable to function nine times out of 20... I don't understand why that warrants benefits back to 2009. Because, Your Honor, I think the nature of his condition is this cyclical condition. And unless there are any further questions, I'm gonna reserve the rest of my time for rebuttal. But thank you. Ms. Friesen. May I please the court? My name is Jolita Friesen, and I'm here on behalf of the Acting Commissioner for the Social Security Administration. Plaintiff's argument in this case focuses on small parts of the record rather than the record as the whole, which is what the ALJ was required to do in this case. In fact, plaintiff improperly raises irrelevant policy issues of available medical care in Iowa and the use of nurse practitioners. This court's review is confined to the administrative record. Furthermore, as I will discuss in more detail later, the ALJ here properly considered and weighed the opinions of plaintiff's nurse practitioner. The ALJ thoroughly discussed medical evidence in the record when noting plaintiff's severe impairments. Those severe impairments included bipolar disorder, ADHD, personality intermittent explosive disorder, and a substance abuse disorder and reported remission. This translated into significant mental limitations in the ALJ's RFC finding. The ALJ restricted plaintiff to unskilled jobs learned in less than 30 days, making few, if any, decisions that required few changes in the workplace, and giving plaintiff significant social limitations. The ALJ stated that plaintiff could only have brief, superficial interaction with the public and coworkers and only occasional interaction with supervisors. When assessing plaintiff with these mental limitations, the ALJ's credibility analysis is critical in this case. Plaintiff alleged disability at the young age of 27. Here, the ALJ considered plaintiff's reported activities, his improvement with treatment, and the medical evidence of record when evaluating the severity of plaintiff's mental impairments. First, the ALJ considered... What's your best circuit court case affirming the denial of benefits to someone diagnosed as bipolar? I'm not sure if it was bipolar disorder, but the cases that we brought to the court's attention in particular involving... Those people can be psychotic. We see them in the criminal justice system all the time. I agree. Give me the circuit cases that deal with bipolar disorders and disability. I'm sure there are. I can't name one right now. I would distinguish the Pates Fires case from this case, which did involve somebody with disability. Off the top of my head, I don't have a specific bipolar case. The suggestion when you say bipolar is he's psychotic. Is there a universe of social security disability cases for those with psychoses? I think a person with bipolar disorder has both manic and depressive symptoms. I think it's a case-by-case basis, which is why the courts look at a variety of cases when... I suspect that's true. I didn't see a focus on that in the briefs. ADHD, I don't know that that's pretty common and not dangerous.  might be reluctant to take on someone who's psychotic, depending upon how it manifests. There's no... If there's case law that the party said, marshal it for us. I'm sure there's case law on bipolar disorder. I wouldn't necessarily classify bipolar disorder as somebody who's psychotic, but there are definite manifestations of manic and depressive symptoms. It usually depends on whether they're taking their meds or not, too. I would agree, Your Honor. What's the medication history here? He has been compliant with medication and he improved with treatment when he was on his medication. I think even Nurse Jessamine stated that he took medication. Why were there the fluctuations over that two or three year period? Was it because when he was taking his meds, he would go up to 61 to 70? Or if he wasn't taking his meds or had some other problems, he was down below 50? I think in some instances there were situational and legal stressors that were causing the change in the GAF scores, but I think the ALJ also looked at times in which plaintiff went in to the nurse practitioner, had these symptoms, had a low GAF score, and his medications were adjusted, and then at the next appointment he had showed improvement. So I think it's probably a combination of working with the medications in order to make plaintiff's mood stable and adjusting when he had situational and legal stressors that came up. So with the meds he was okay unless there was a stress episode? Well, I think maybe medications needed to be adjusted over time. That all was sort of okay. The ALJ also considered inconsistencies in plaintiff's activities and his self-reported limitations. This was an important part of the ALJ's credibility analysis. Plaintiff testified at his hearing that he isolated himself and didn't like to be around people. He also argues that he had marked limitations in social functioning and concentration, persistence, and pace. However, the ALJ noted that this was inconsistent with plaintiff's report in the record that he watched his children when his girlfriend worked. He had enough concentration to watch movies all day. He prepared his own meals and shopped. He had his oldest son on the weekends and he took him to the library and fishing. At one point, plaintiff lived on his own in his apartment and managed food stamps. In fact, the ALJ noted that plaintiff did better when he lived on his own and he was more stable. Plaintiff reported that he and he was motivated to find a job. Further, plaintiff's mother also contradicted his claim in her function report that he was isolated himself because she stated that he visited her on a daily basis. The ALJ properly considered this evidence in determining plaintiff's allegations were not entirely credible. The ALJ also considered, as we just discussed, that plaintiff's mental impairment did improve with treatment. Eight months before he claimed disability, plaintiff did have a serious episode of deterioration of his mental status that led to his hospitalization. But a subsequent medical evidence showed that by December 2008, plaintiff's mood was euthymic and he had a GAF score of 61 to 70. Although the plaintiff's scores fluctuated due to stressors and legal issues, as we discussed before, with treatment and adjustments to his medications, plaintiff's mood stabilized. Next, the ALJ considered the medical opinions in determining that plaintiff's allegations were not entirely credible. The ALJ's consideration of these medical opinions is the crux of plaintiff's argument in this case. Plaintiff believes the ALJ's listing, RFC finding, and hypothetical were flawed because of the ALJ's analysis of the medical opinions. The ALJ's analysis was proper, as it is the ALJ's function to resolve conflicts among the various opinions. And that's exactly what the ALJ did in this case. First, looking at the nurse practitioner. The ALJ gave good reasons for discounting the nurse practitioner's opinion, which was contradicted by her treatment notes. The nurse practitioner's treatment notes reflect that plaintiff  calmer, less irritable, more stable, had better concentration, felt good, spent more time with his children, went out more, and looked for a job. He showed improvement in energy, motivation, anger, mood, and concentration. Although plaintiff wants to focus solely on GAF scores, those scores are an assessment of the time in which the plaintiff is there for treatment, and it's a one-time assessment. When looking not only at the GAF scores, but also these observations that nurse Jessman made at these appointments, you can see that there were improvements in plaintiff's overall mood, energy, and concentration. Next, plaintiff's argument that the nurse practitioner should be given treating source deference due to the lack of primary care physicians in Iowa is contrary to the agency's regulations. The agency considers nurse practitioners important other sources, but they are not acceptable medical sources. As an other source, the ALJ had more discretion when considering the nurse practitioner's opinion and was permitted to consider any inconsistencies found within the record. For example, another inconsistency that the ALJ considered was the nurse practitioner stated in her opinion that the highest GAF score plaintiff had had for the past year was 50. That was not correct when you look back at the nurse practitioner's treatment notes. In April and June 2010, she found GAF scores of 51-70 and in July and October of 2010, she gave GAF scores of 50-60. The ALJ felt that this inconsistency in her opinion was important. Further, plaintiff's argument is not supported by the record. There is no evidence that plaintiff tried to seek treatment from a physician but could not find one. Alternatively, plaintiff argues that the ALJ should have given the nurse practitioner's opinion treating source deference because she participated in a team approach to treatment that included a physician. This argument seems somewhat inconsistent with plaintiff's prior argument that plaintiff couldn't obtain a physician in Iowa. However, this argument is also not supported by the record. There is no evidence that a physician participated with a nurse practitioner in his care and there is no report from an acceptable medical source. Further, plaintiff's citation to a website is evidence outside the record and is not proper. Focusing on one portion of Dr. Gibson's opinion, plaintiff does try to argue that his report supports the finding of disability. Dr. Gibson did state that plaintiff's capacity to maintain attention, concentration and pace and his problems interacting with individuals at work impaired plaintiff's ability to maintain full-time employment. However, Dr. Gibson went on to state that plaintiff could adapt to changes in the workplace in a solitary work environment. Dr. Gibson also opined unlike Nurse Jessman, that plaintiff could remember and understand simple instructions, procedures and locations in a work setting. Giving this opinion partial weight, the ALJ did limit plaintiff to unskilled work learned in 30 days or less and the ALJ limited plaintiff's interaction with the public, coworkers and supervisors. Dr. Ryan, the state agency non-examining psychological consultant also looked at the evidence of the record including the report of Dr. Gibson. She concluded plaintiff experienced moderate mental limitations. Considering plaintiff's medical behavior at appointments, Dr. Ryan thought plaintiff demonstrated the capacity to have appropriate interactions and in fact that's one of the things that the ALJ discussed in his opinion. Plaintiff was able to go to these various medical appointments and interact with his treatment providers and they did not observe explosive behavior towards them. What's in the record about the quitting of the roofing job? I believe that was in 2008 when... That was his last relevant work? At least in what he reported in the record. In 2008 he said he had been roofing. And did he get in an altercation or did he just say I don't like my coworkers and quit? Or was he fired because he couldn't get along? I don't recall. He's got the physical ability to do the... to be an assistant roofer. Correct. So I don't understand why that wasn't... there was the step four finding he can't do his past relevant work. Well because he could physically do it but the ALJ found severe mental limitations and I and the vocational expert discussed the issue of plaintiff's inability to interact appropriately with coworkers and thinking... What was the inappropriate action? Well plaintiff reports that he gets into arguments with coworkers.  evidence that he lost jobs due to arguments. As this court has consistently observed a court should disturb the ALJ's decision only if it falls outside the zone of choice. A decision is not outside that zone of choice simply because the court may have reached a different conclusion had the court been the fact finder in the first instance.  with regard to the hypothetical the ALJ provided to the vocational expert also suggests that the ALJ also stems from his disagreement of the consequence of the ALJ's assessment of the medical opinions. The hypothetical must capture the concrete consequences of the claimant's deficiencies not the diagnoses. The ALJ included all of the limitations he found credible in the hypothetical and properly concluded plaintiff was capable of performing other work and was not disabled. For these reasons we request the court affirm the ALJ's decision denying benefits. If there are no further questions I thank the court for the opportunity to appear today. I want to hit a couple of points very quickly because I don't have much time to talk about it. First of all when it comes to weighing the opinion of a nurse practitioner as an other medical source we can see that Deshanto's case is probably not apposite in this particular case but rather the Sloan case and Social Security ruling 063P are going to be the proper ways of weighing this. The district court actually disregarded Ms. Juspin's opinions under this alternate rationale that she was a nurse practitioner but cited the case of Rainey v. Barnhart to say that any inconsistency would allow this to be disregarded. I don't think Rainey is good law anymore because it was decided prior to Sloan and prior to the issue and so the Social Security ruling 063P upon which Sloan was based. I'm out of time. Thank you very much for your time unless there are any other questions. Thank you very much. Thank you. The case has been thoroughly and well briefed and argued and we'll take it under advisement.